## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____

| | | |
|---|---|---|
| ERIK HENNE, Derivatively on Behalf of Nominal Defendant DIGITAL RIVER, INC., | ) ) ) | No. _____ |
| | ) | |
| Plaintiff, | ) ) | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | ) ) ) | |
| JOEL A. RONNING, CARTER D. HICKS, GARY V. HOWORKA, JAY A. KERUTIS, ROBERT E. STRAWMAN, PERRY W. STEINER, GREGORY R. L. SMITH, KELLY J. WICAL, THOMAS F. MADISON, J. PAUL THORIN, WILLIAM J. LANSING, FREDERIC M. SEEGAL and TIMOTHY C. CHOATE, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | **JURY TRIAL DEMANDED** |
| DIGITAL RIVER, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

_____

Plaintiff Erik Henne, by the undersigned attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Digital River, Inc. ("Digital River" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2.      On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

3.      At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves.  And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

4.      At the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."  The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

5.      In his statement before the Senate Finance Committee Deputy Attorney General Paul J. McNulty, described the practice of stock option backdating "as a brazen abuse of

corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

6.      On September 6, 2006, *MarketWatch*, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

7.      On July 22, 2006, *The San Francisco Chronicle* recounted SEC Chairman Christopher Cox's announcement in San Francisco on July 20, 2006 where he said, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

8.      On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here . . . . It's a question of knowingly betting on a race that's already been run."

9.     On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

10.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Digital River, the Individual Defendants (as defined herein) colluded with one another to:

a.     improperly backdate grants of Digital River stock options to Digital River's Chief Executive Officer Joel A. Ronning and several other Digital River executives, in violation of the Company's shareholder-approved stock option plans;

b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

c.     improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.     produce and disseminate false financial statements and other SEC filings to Digital River shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

11.     As a result of the Individual Defendants' egregious misconduct, Digital River has sustained millions of dollars in damages, and Ronning and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.      Plaintiff Erik Henne is, and was at all relevant times, a shareholder of nominal defendant Digital River.

15.     Nominal defendant Digital River is a Delaware corporation with its principal executive offices located at 9625 West 76th Street, Eden Prairie, Minnesota 55344.  According to its public filings, the Company provides outsourced e-commerce solutions globally for a wide variety of companies primarily in the software and high-tech products markets.  The Company's services include online store design, development and hosting, store merchandising and optimization, order management, fraud prevention screening, export controls and management, tax management, digital product delivery via download, physical product fulfillment, multi-lingual customer service, e-mail marketing, website optimization, lab analytics and reporting.

## Officer Defendants

16.     Defendant Joel A. Ronning ("Ronning") has served as the Company's Chief Executive Officer and as a director since founding the Company in 1994.  Ronning also served as a member of the Company's Office of the President from 2001 to 2004, and as President from February 1994 to July 1998.

17.     Defendant Carter D. Hicks ("Hicks") served as a non-executive employee of the Company from July 2005 to December 2005, as Chief Financial Officer from April 2002 to July 2005, and as Senior Vice President - Software and Digital Commerce Services Operations from November 2000 to April 2002.

18.     Defendant Gary V. Howorka ("Howorka") served as the Company's Senior Vice President - Advanced Technologies from September 2003 to in or about 2004, and as Chief Technology Officer from June 2000 to September 2003.

19.     Defendant Jay A. Kerutis ("Kerutis") reported to the Company's Chief Executive Officer on strategic sales matters from October 2003 to in or about 2005, served as the Company's President, Software and Digital Commerce Service Division from December 2000 to September 2003, as a member of the Office of the President from February 2001 to September 2003, as Executive Vice President, Software and Digital Commerce Service Division from January 2000 to December 2000, and as Vice President of Sales from February 1999 to January 2000.

20.     Defendant Robert E. Strawman ("Strawman") served as the Company's Chief Financial Officer and Treasurer from April 1998 to April 2002, and as a member of the Office of the President from February 2001 to April 2002.

21.     Defendant Perry W. Steiner ("Steiner") has served as a director of the Company since April 1998, and as a member of the Audit Committee of the Board ("Audit Committee") from fiscal 2002 to May 2003 and since March 2004.  Steiner also served as the Company's President from August 1998 to February 2001.

22.     Defendant Gregory R. L. Smith ("Smith") served as the Company's Vice President of Finance from June 1999 to in or about 2002, as Secretary from December 1997 to in or about 2002, and as Controller from June 1997 to December 1997.

23.     Defendant Kelly J. Wical ("Wical") served as an advisor to the Company from August 2000 to October 2000, and as Chief Technology Officer from April 1997 to August 2000.

24.     Collectively, defendants Ronning, Hicks, Howorka, Kerutis, Strawman, Steiner, Smith and Wical are referred to herein as the "Officer Defendants."

### Director Defendants

25.     Defendant Thomas F. Madison ("Madison") has served as a director of the Company since August 1996, as Lead Director since February 2005, and as a member of the Audit Committee and the Compensation Committee of the Board ("Compensation Committee") since fiscal 1998.

26.     Defendant J. Paul Thorin ("Thorin") has served as a director of the Company since June 1996, and as a member of the Audit Committee since fiscal 1998.  Thorin also served as a member of the Compensation Committee from fiscal 1998 to fiscal 2001.

27.     Defendant William J. Lansing ("Lansing") has served as a director of the Company since November 1998, and as a member of the Compensation Committee since fiscal

1998.  Lansing also served as a member of the Audit Committee from May 2003 to March 2004.

28.     Defendant Frederic M. Seegal ("Seegal") has served as a director of the Company since June 2000, and as a member of the Compensation Committee since fiscal 2002.

29.     Defendant Timothy C. Choate ("Choate") served as a director of the Company from May 1998 to May 2003, and as a member of the Audit Committee from May 1998 to in or about May 2002.

30.     Collectively, defendants Ronning, Steiner, Madison, Thorin, Lansing, Seegal and Choate are referred to herein as the "Director Defendants."

31.     The following chart summarizes the positions of the Director Defendants:

| Defendant | Recipient of Backdated Option Grants | Member of Compensation Committee at the Time of the Backdated Option Grants | Member of the Audit Committee at the Time of the Backdated Option Grants |
|---|---|---|---|
| Ronning | x | | |
| Steiner | x | | x |
| Madison | x | x | x |
| Thorin | x | x | x |
| Lansing | x | x | x |
| Seegal | x | x | |
| Choate | x | | x |

32.     Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.      By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

      b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

      c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by

law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

36.     The Individual Defendants, particularly the Officer Defendants and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)     transactions are executed in accordance with management's general or specific authorization; and

(b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

37.     Digital River's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.      Review, upon completion of the audit, the financial

statements to be included in the Company's Annual Report on Form 10-K;

b.      Discuss with management and the outside auditors the results of the auditor's review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the outside auditors under Statement on Auditing Standards No. 61.   A member of the Committee may be represent the entire Committee for purposes of this discussion;

c.      Review with counsel, the outside auditors and management, as appropriate, any significant regulatory or other legal or accounting matters that could have a material impact on the Company's financial statements, compliance programs and policies;

d.      Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

e.      Report to the Board of Directors with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the performance or independence of the Company's independent auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so;

f.      Discuss with the outside auditors and management, as appropriate, the results of the annual audit, including the auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any audit adjustments noted or proposed by the outside auditors (whether "passed" or implemented in the financial statements), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the outside auditors under Statement on Auditing Standards No. 61; and

g.      Review with management and the outside auditors major

issues that arise regarding accounting principles and financial statement presentations, including the adoption of new, or material changes to existing, critical accounting policies or to the application of those policies, the potential effect of alternative accounting policies available under GAAP, the potential impact of regulatory and accounting initiatives and any other significant reporting issues and judgments.

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Individual Defendants

38.     According to Digital River's proxy statements, the Board and the Compensation Committee "administer[ed]" the Company's option plans and "grant[ed] options under the plan[s] to officers and directors of the [C]ompany."

39.     From 1999 to 2004, the Board and the Compensation Committee granted certain backdated Digital River stock options to the Individual Defendants, as follows:

| Purported Date of Grant | Name | Exercise Price | Number of Options[1] |
|---|---|---|---|
| 02/18/99[2] | Kerutis | $29.1875 | 150,000 |
| 08/10/99 | Kerutis | $19.5625 | 75,000 |
| | Strawman | $19.5625 | 20,000 |
| | Steiner | $19.5625 | 150,000 |
| | Wical | $19.5625 | 15,000 |
| | Madison | $19.5625 | 15,000 |

[1] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but were first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

[2] The Company's annual proxy statement filed with the SEC on March 31, 2000 reported a purported grant date of February 15, 1999.  However, the exercise price is equal to the closing price of the Company's Common Stock on February 18, 1999.

| | | | |
|---|---|---|---|
| 08/02/00 | Ronning[3] | $6.375 | 200,000 |
| | Ronning[4] | $6.375 | at least 168,628 |
| | Howorka[5] | $6.375 | at least 144,375 |
| | Kerutis | $6.375 | 125,000 |
| | Strawman | $6.375 | 40,000 |
| | Steiner[6] | $6.375 | 150,000 |
| | Smith | $6.375 | 20,000 |
| 01/02/01[7] | Hicks[8] | $2.59 | at least 65,624 |
| | Howorka | $2.59 | 25,000 |
| | Kerutis | $2.59 | 80,000 |
| | Strawman | $2.59 | 80,000 |
| 02/21/01 | Ronning | $5.125 | 1,000,000 |
| | Steiner | $5.125 | 90,000 |
| | Madison | $5.125 | 60,000 |
| | Thorin[9] | $5.125 | 60,000 |

---

[3] The Company's annual proxy statement filed with the SEC on March 27, 2001 reported a purported grant date of August 6, 2000 for the 200,000 shares granted to defendant Ronning. However, the exercise price is equal to the closing price of the Company's Common Stock on August 2, 2000, the same date Digital River stock options were granted to defendants Kerutis, Strawman and Smith.

[4] The $6.375 exercise price and the grant of 168,628 shares reflect the information reported in Ronning's Form 4 filed with the SEC on October 27, 2004, and the $6.375 exercise price and the grant of 200,000 shares reflect the information reported in Ronning's Form 4 filed with the SEC on November 2, 2004.

[5] The exercise price and number of grants reflect the information reported in Howorka's Form 4s filed with the SEC on December 2, 2002, May 6, 2003 and August 4, 2003.

[6] The Company's annual proxy statement filed with the SEC on March 27, 2001 reported a purported grant date of August 6, 2000. However, the exercise price is equal to the closing price of the Company's common stock on August 2, 2000, the same date Digital River stock options were granted to defendants Kerutis, Strawman and Smith.

[7] The Company's annual proxy statement filed with the SEC on April 19, 2002 reported a purported grant date of January 1, 2001 for the Digital River stock option grants to Howorka, Kerutis and Strawman.

[8] The exercise price and number of grants reflect the information reported in Hicks' Form 4 filed with the SEC on August 13, 2003.

[9] Defendant Thorin's Form 4s filed with the SEC on February 7, 2003 and January 26, 2005 reported a purported grant date of February 20, 2001 with an exercise price of $5.125, the closing price of the Company's common stock

|  |  |  |  |
|---|---|---|---|
|  | Lansing | $5.125 | 60,000 |
|  | Seegal | $5.125 | 60,000 |
|  | Choate | $5.125 | 60,000 |
| 02/08/02 | Ronning | $13.92 | 200,000 |
|  | Kerutis | $13.92 | 100,000 |
|  | Steiner | $13.92 | 6,250 |
|  | Seegal | $13.92 | 13,125 |
|  | Choate[10] | $13.92 | 10,000 |
| 04/17/02 | Kerutis | $5.01 | 250,000 |
| 05/01/02 | Hicks | $4.65 | 120,000 |
|  | Howorka | $4.65 | 50,000 |
| 02/13/03 | Ronning | $10.50 | 200,000 |
|  | Hicks | $10.50 | 50,000 |
|  | Howorka | $10.50 | 15,000 |
|  | Kerutis | $10.50 | 100,000 |
|  | Steiner | $10.50 | 10,000 |
|  | Madison | $10.50 | 27,500 |
| 02/09/04 | Ronning | $22.98 | 200,000 |
|  | Steiner | $22.98 | 22,500 |
|  | Madison | $22.98 | 27,500 |
|  | Thorin | $22.98 | 22,500 |
|  | Lansing | $22.98 | 25,000 |
|  | Seegal | $22.98 | 25,000 |
| 03/09/04 | Hicks | $20.60 | 50,000 |

40.     Pursuant to the terms of the Company's shareholder approved stock option plans,

---

on February 21, 2001, the same date Digital River stock options were granted to defendants Ronning, Steiner, Madison, Lansing, Seegal and Choate.

[10] Defendant Choate's Form 4 filed with the SEC on February 10, 2003 reported a purported grant date of February 7, 2002 with an exercise price of $13.92, the closing price of the Company's Common Stock on February 8, 2002, the same date Digital River stock options were granted to defendants Ronning, Kerutis, Steiner and Seegal.

including the 1998 Stock Option Plan and the 1999 Stock Option Plan, the exercise price of all options must not be less than "the fair market value of the Company's Common Stock on the date of grant."

41.     Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

42.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

43.     In a striking pattern that could not have been the result of chance, the backdated Digital River stock option grants coincided with some of Digital River's lowest closing prices, as demonstrated in the following charts:

a.    1999 Stock Price Performance:



b.    2000 Stock Price Performance:



c.    2001 Stock Price Performance:



d.    2002 Stock Price Performance:



44.    The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.    Rather, at the behest of the Officer Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Digital River stock was lower than the market

price on the actual grant dates.  This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Individual Defendants and improperly reduced the amounts they had to pay the Company upon exercise of the options.

45.     According to a statistical analysis conducted by Plaintiff, there is a 99.5% likelihood that the fortuitous pattern of option grants alleged herein was not the result of random chance.  Indeed, the only explanation that is consistent with the observed pattern is that the options were backdated to coincide with favorable dates when the price of Digital River stock was particularly low.

46.     Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.  Pursuant to SOX, beginning on August 29, 2002, executives were required to report option grants to the SEC within two days of the grant

47.     In a report released on October 20, 2006, the research firm of Glass Lewis conducted an extensive study surrounding the belief that late Form 4 filings can be one of the signs of post-SOX stock option backdating (the "Glass Lewis Report").  Specifically, according to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where the price of the underlying stock increased materially between the purported grant date and the day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was backdated."

48.     Digital River was among the companies questioned following the completion of the Glass Lewis Report, and the Company responded by classifying its late reporting of the backdated stock option grants as a "major paperwork screw-up."

49.     Although the Individual Defendants who received the options grant were required to report them to the SEC within two days of the grants pursuant to SOX, they did not do so.  In fact, Ronning, Howorka and Kerutis never reported their purported February 13, 2003 stock option grants; Hicks did not report his purported February 13, 2003 stock option grant until almost a year later on March 2, 2004; Steiner did not report his purported February 13, 2003 stock option grant until June 19, 2006; and Madison did not report his purported February 13, 2003 stock option grant until February 17, 2006.

50.     As reflected in the following graphs, the Digital River stock option grants purportedly dated February 13, 2003 coincide with one of Digital River's lowest closing stock prices of 2003:



51.     Similarly, defendants Ronning, Steiner, Madison, Thorin, Lansing and Seegal did

not report their purported February 9, 2004 stock option grants until June 21, 2004, while defendant Hicks did not report his purported March 9, 2004 stock option grant until June 21, 2004. The following graph reflects the change in price of Digital River stock between the purported dates of grant and the date that these defendants ultimately disclosed the grants on June 21, 2004:



52. Like the pre-SOX grants, the reason for the patterns set forth in the preceding paragraphs with respect to the post-SOX grants is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the Officer Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Digital River stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Company's shareholder-approved stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Individual Defendants and improperly reduced the amounts they had to pay the Company

upon exercise of the options.

## **Defendants' Dissemination of False Financial Statements**

53.     As a result of the improper backdating of stock options, the Company, with the

knowledge, approval, and participation of each of the Individual Defendants,

> a.      violated the terms of the Company's shareholder-
> approved stock option plans by granting stock options
> with exercise prices less than the fair market value of the
> stock on the actual date of grant;
>
> b.      violated APB by failing to recognize compensation
> expenses incurred when the improperly backdated options
> were granted;
>
> c.      violated Section 162(m) by taking tax deductions based
> on stock option grants that were not payable solely on
> account of the attainment of one or more performance
> goals and violated the terms of the Company's
> shareholder-approved stock option plans; and
>
> d.      produced and disseminated false financial statements to
> Digital River shareholders and the market that improperly
> recorded and accounted for the backdated option grants,
> and thereby understated compensation expenses and
> overstated net income.

54.     The Company, with the knowledge, approval, and participation of each of the

Individual Defendants, disseminated its false financial statements in, *inter alia*, the following

Form 10-K filings:

> a.      Form 10-K for the fiscal year ended December 31, 1999,
> filed with the SEC on March 30, 2000, and signed by
> defendants Ronning, Strawman, Steiner, Lansing,
> Madison, Thorin and Choate;
>
> b.      Form 10-K405 for the fiscal year ended December 31,
> 2000 filed with the SEC on March 27, 2001, and signed
> by defendants Ronning, Strawman, Steiner, Lansing,
> Madison, Thorin and Choate;

    c.      Form 10-K405 for the fiscal year ended December 31, 2001, filed with the SEC on April 1, 2002, and signed by defendants Ronning, Strawman, Steiner, Lansing, Madison, Thorin, Seegal and Choate;

    d.      Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 28, 2003, and signed by the defendants Ronning, Hicks, Steiner, Lansing, Madison, Thorin, Seegal and Choate;

    e.      Form 10-K for the fiscal year ended December 31, 2003 filed with the SEC on March 15, 2004, and signed by defendants Ronning, Hicks, Steiner, Lansing, Madison, Thorin and Seegal; and

    f.      Form 10-K for the fiscal year ended December 31, 2004 filed with the SEC on March 16, 2005, and signed by defendants Ronning, Hicks, Steiner, Lansing, Madison, Thorin and Seegal.

### Defendants' Concealment of Their Misconduct

55.     From 2000 to 2005, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that options were granted to the Individual Defendants at "the fair market value of the Company's Common Stock on the date of grant," as follows:

    a.      Digital River's proxy statement filed with the SEC on March 31, 2000 falsely reported that options granted to Kerutis were granted on February 15, 1999, and that options granted to Steiner, Kerutis, Wical and Strawman were granted on August 10, 1999, and that the exercise prices of these options were equal to "the fair market value of the Company's Common Stock on the date of grant;"

    b.      Digital River's proxy statement filed with the SEC on March 27, 2001 falsely reported that options granted to

Kerutis, Strawman and Smith were granted on August 2, 2000, and that options granted to Ronning and Steiner were granted on August 6, 2000, and that the exercise prices of these options were equal to "the fair market value of the Company's Common Stock on the date of grant;"

c.  Digital River's proxy statement filed with the SEC on April 19, 2002 falsely reported that options granted to Howorka, Kerutis and Strawman were granted on January 1, 2001 and that options granted to Ronning were granted on February 20, 2001, and that the exercise prices of these options were equal to "the fair market value of the Company's Common Stock on the date of grant;"

d.  Digital River's proxy statement filed with the SEC on April, 18, 2003 falsely reported that options granted to Ronning and Kerutis were granted on February 8, 2002, that options granted to Kerutis were granted on April 17, 2002 and that options granted to Howorka and Hicks were granted on May 1, 2002, and that the exercise prices of these options were equal to "the fair market value of the Company's Common Stock on the date of grant;"

e.  Digital River's proxy statement filed with the SEC on April 7, 2004 falsely reported that options granted to Ronning, Hicks, Howorka and Kerutis were granted on February 13, 2003, and that the exercise price of these options was equal to "the fair market value of the Company's Common Stock on the date of grant;" and

f.  Digital River's proxy statement filed with the SEC on April 7, 2005 falsely reported that options granted to Ronning were granted on February 9, 2004, and that options granted to Hicks were granted on March 9, 2004, and that the exercise prices of these options were equal to "the fair market value of the Company's Common Stock on the date of grant."

56.  From 2002 to 2006, Digital River, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of

concealing the improper option backdating, filed with the SEC Form 4's that falsely reported the

dates of stock option grants to the Individual Defendants, as follows:

a.  Madison's Form 4 filed with the SEC on December 1, 2004 falsely reported that options granted to Madison had been granted on August 10, 1999;

b.  Howorka's Form 4s filed with the SEC on December 2, 2002, May 6, 2003 and August 4, 2003 falsely reported that options granted to Howorka had been granted on August 2, 2000;

c.  Ronning's Form 4s filed with the SEC on October 27, 2004 and November 2, 2004 falsely reported that options granted to Ronning had been granted on August 2, 2000;

d.  Ronning's Form 4 filed with the SEC on August 4, 2005 falsely reported that options granted to Ronning had been granted on August 6, 2000;

e.  Howorka's Form 4s filed with the SEC on May 6, 2003 and August 4, 2003 falsely reported that options granted to Howorka had been granted on January 2, 2001;

f.  Hicks' Form 4s filed with the SEC on August 13, 2003 and June 1, 2004 falsely reported that options granted to Hicks had been granted on January 2, 2001;

g.  Kerutis' Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Kerutis had been granted on January 2, 2001;

h.  Thorin's Form 4s filed with the SEC on February 7, 2003, January 26, 2005, March 17, 2005 and February 23, 2006 falsely reported that options granted to Thorin had been granted on February 20, 2001;

i.  Madison's Form 4s filed with the SEC on November 25, 2002, December 1, 2003 and October 25, 2004 falsely reported that options granted to Madison had been granted on February 21, 2001;

j.  Steiner's Form 4s filed with the SEC on November 25, 2002, November 13, 2003 and October 26, 2004 falsely

reported that options granted to Steiner had been granted on February 21, 2001;

k.    Seegal's Form 4s filed with the SEC on November 25, 2002, June 3, 2004, October 28, 2004, November 2, 2005 and February 24, 2006 falsely reported that options granted to Seegal had been granted on February 21, 2001;

l.    Choate's Form 4 filed with the SEC on November 29, 2002 falsely reported that options granted to Choate had been granted on February 21, 2001;

m.    Lansing's Form 4 filed with the SEC on July 30, 2003 falsely reported that options granted to Lansing had been granted on February 21, 2001;

n.    Ronning's Form 4s filed with the SEC on August 4, 2005, August 5, 2005 and August 9, 2005 falsely reported that options granted to Ronning had been granted on February 21, 2001;

o.    Choate's Form 4 filed with the SEC on February 10, 2003 falsely reported that options granted to Choate had been granted on February 7, 2002;

p.    Seegal's Form 4s filed with the SEC on November 13, 2003 and June 3, 2004 falsely reported that options granted to Seegal had been granted on February 8, 2002;

q.    Steiner's Form 4s filed with the SEC on November 13, 2003 and October 26, 2004 falsely reported that options granted to Steiner had been granted on February 8, 2002;

r.    Kerutis's Form 4 filed with the SEC on October 3, 2003 falsely reported that options granted to Kerutis had been granted on April 17, 2002;

s.    Howorka's Form 4 filed with the SEC on August 4, 2003 falsely reported that options granted to Howorka had been granted on May 1, 2002;

t.    Hicks' Form 4s filed with the SEC on August 13, 2003, June 1, 2004 and December 1, 2004 falsely reported that options granted to Hicks had been granted on May 1, 2002;

u.    Hicks' Form 4s filed with the SEC on March 2, 2004, June 1, 2004 and December 1, 2004 falsely reported that options granted to Hicks had been granted on February 13, 2003;

v.    Madison's Form 4 filed with the SEC on February 17, 2006 falsely reported that options granted to Madison had been granted on February 13, 2003;

w.    Steiner's Form 4 filed with the SEC on June 19, 2006 falsely reported that options granted to Steiner had been granted on February 13, 2003;

x.    Ronning's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Ronning had been granted on February 9, 2004;

y.    Seegal's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Seegal had been granted on February 9, 2004;

z.    Thorin's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Thorin had been granted on February 9, 2004;

aa.    Lansing's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Lansing had been granted on February 9, 2004;

bb.    Steiner's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Steiner had been granted on February 9, 2004;

cc.    Madison's Form 4 filed with the SEC on June 21, 2004 falsely reported that options granted to Madison had been granted on February 9, 2004; and

dd.    Hicks' Form 4s filed with the SEC on June 21, 2004 and December 1, 2004 falsely reported that options granted to Hicks had been granted on March 9, 2004.

57.    Despite the Individual Defendants being specifically questioned about the Company's failure to timely report Digital River stock option grants, the investing public was not aware of the backdating scheme alleged herein until the filing of this Complaint.

## INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

58.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the Individual Defendants breached their fiduciary duties by:

a.    colluding with each other to backdate stock option grants;

b.    colluding with each other to violate GAAP and Section 162(m);

c.    colluding with each other to produce and disseminate to Digital River shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

d.    colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

59.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

60.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required

to incur and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

61.     As alleged herein, certain of the Individual Defendants have exercised hundreds of thousands of backdated options at improperly low prices and have then sold the shares for substantial profits.  Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

62.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

63.     Plaintiff is an owner of Digital River common stock and was an owner of Digital River common stock at all times relevant hereto.

64.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

65.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Digital River Board of Directors to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

66.     The Board currently consists of six directors: defendants Ronning, Steiner, Madison, Thorin, Lansing and Seegal.  The following directors are incapable of independently

and disinterestedly considering a demand to commence and vigorously prosecute this action:

a.    Ronning, because he is directly interested in the improperly backdated stock option grants complained of herein as a recipient of the backdated stock option grants, and because his principal professional occupation is his position as Chief Executive Officer of the Company.  In his position as Chief Executive Officer, Ronning stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by Defendants Madison, Lansing and Seegal who are currently on the Compensation Committee.  Accordingly, Ronning is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

b.    Steiner, Madison, Thorin, Lansing, and Seegal, because they are directly interested in the improperly backdated stock option grants complained of herein as recipients of the backdated stock option grants.  Accordingly, Steiner, Madison, Thorin, Lansing and Seegal are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

c.    Madison, Thorin, Lansing and Seegal, because as past and present members of the Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Officer Defendants, as alleged herein, Madison, Thorin, Lansing and Seegal have demonstrated that they are unable or unwilling to act independently of the Officer Defendants;

d.    Steiner, Madison, Thorin and Lansing, because as past and present members of the Audit Committee they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Officer Defendants, as alleged herein, Steiner, Madison, Thorin and Lansing have demonstrated that they are unable or unwilling to act independently of the Officer Defendants; and

e.   Ronning, Steiner, Madison, Thorin, Lansing and Seegal, because as directors of the Company they directly participated in and approved the Company's filing of false financial statements and other SEC filings, as alleged herein.  Moreover, by colluding with the Officer Defendants and others, as alleged herein, Ronning, Steiner, Madison, Thorin, Lansing and Seegal have demonstrated that they are unable or unwilling to act independently of the Officer Defendants.

67.   Furthermore, demand is excused because the misconduct complained of herein was ultra vires and, therefore, was not, and could not have been, an exercise of good faith business judgment.  As represented in Digital River's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is "to improve individual performance, to attract and retain the services of persons with experience and ability, and to associate the interests of such persons with those of the Company's stockholders."  However, by granting options with backdated exercise prices, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Digital River's stock performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

68.   The Individual Defendants could have achieved the stated purpose of "attracting and retaining the services of persons with experience and ability" by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Individual Defendants were motivated and retained Digital River's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

69.   The practice of backdating stock options cannot be a valid exercise of business

judgment because it has subjected Digital River to potentially massive liability.  Digital River will likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I

### Against the Individual Defendants for
### Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

72.     The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

73.     The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

31

74.     The Company relied upon the Individual Defendants' fraud in granting the Individual Defendants options to purchase shares of the Company's common stock, as alleged herein.

75.     As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur and the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT II

### Against the Individual Defendants for
### Violations of §14(a) of the Securities Exchange Act

76.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.     Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14-A-9.

78.     The proxy statements described herein violated §14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing Digital River to engage in an option backdating scheme, a fact which the Individual Defendants were aware of and participated in from at least 1999.

79.     In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

80.     The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

81.     The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against Ronning, Hicks, Strawman and the Director Defendants for Violations of §20(a) of the Securities Exchange Act

82.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

83.     Ronning, Hicks, Strawman and the Director Defendants, by virtue of their positions with Digital River and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Digital River within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Digital River to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for
### Accounting

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

86.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

87.     The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

88.     As a result of the Individual Defendants' misconduct, Digital River has been damaged financially and is entitled to a recovery as a result thereof.

89.     Plaintiff demands an accounting be made of all stock option grants made to any of the Officer Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Officer Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

92.     As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

93.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

94.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the Officer Defendants at the expense of the Company.

95.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur and the loss of funds paid to the Company upon the exercise of stock options resulting

from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant.

## COUNT VI

### Against the Officer Defendants for
### Unjust Enrichment

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     The Officer Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein and it would be unconscionable to allow them to retain the benefits thereof.

98.     To remedy the Officer Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VII

### Against the Officer Defendants for
### Rescission

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

100.     As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated

stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

101.    All contracts which provide for stock option grants to the Officer Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct;

B.      Ordering the Officer Defendants to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

C.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.


Dated: October 31, 2006                    Respectfully submitted,

                                           HEAD, SEIFERT & VANDER WEIDE, P.A.

                                           */s Vernon J. Vander Weide*
                                           Vernon J. Vander Weide
                                           333 South Seventh Street, Suite 1140
                                           Minneapolis, MN 55402
                                           Telephone: (612) 339-1601
                                           Facsimile:  (612) 339-3372

                                           SCHIFFRIN & BARROWAY, LLP
                                           Eric L. Zagar
                                           Trevan Borum
                                           James Miller
                                           Bradley A. Dirks
                                           280 King of Prussia Road
                                           Radnor, PA 19087
                                           Telephone: (610) 667-7706
                                           Facsimile: (610) 667-7056

                                           *Attorneys for Plaintiff*